Filed 12/14/21 P. v. Follings CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>BRANDON FOLLINGS,<br><br>　　　Defendant and Appellant. | A157571<br><br>(Alameda County<br>Super. Ct. No. 17-CR-023555A) |

A jury convicted appellant Brandon Follings of the first degree murder of Daniel DelToro and of being a felon in possession of a firearm. In reaching its verdict, the jury found true several enhancements and special allegations, including that the crime was committed for the benefit of a criminal street gang and that DelToro had been intentionally killed because he was a witness to a crime. Appellant challenges his conviction on the following grounds: (1) the trial court abused its discretion and violated his constitutional rights to due process and a fair trial by refusing to sever his case from that of his codefendant, Pablo Mendoza;[1] (2) the trial court abused its discretion and violated his constitutional right to confrontation by admitting a rap video showing Mendoza making certain hand signs to

---

[1] We affirmed Mendoza's related convictions earlier this year. (*People v. Mendoza* (Jan. 29, 2021, A157489) [nonpub. opn.].)

1

demonstrate an alliance between Mendoza's gang and appellant's gang; and (3) the evidence was insufficient to support his conviction for first degree murder and the imposition of the gang enhancement. Seeing no error, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In December 2017, an information was filed by the Alameda County District Attorney, charging appellant, Mendoza, and Valeria Rose Boden in count one with DelToro's murder. (Pen. Code,[2] § 187, subd. (a).) With regard to count one, the information alleged that both Mendoza and appellant personally and intentionally discharged a firearm which proximately caused great bodily injury and death (§§ 12022.5, subd. (a), 12022.53, subds. (b)–(d), (e)(1) & (g)), doing so for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)), and that the charged murder was a serious felony (§ 1192.7, subd. (c)(8)) and a violent felony (§ 667.5, subd. (c)). The information further alleged a special circumstance that the murder was committed against a witness to a crime. (§ 190.2, subd. (a)(10).) Counts two and three charged appellant and Mendoza, respectively, with possession of a firearm by a felon. (§ 29800, subd. (a)(1).) Appellant was alleged to have sustained two prior felony convictions. Additional enhancements were alleged with respect to Boden and Mendoza. Prior to trial, Boden's matter was severed from that of Mendoza and appellant.

Jury trial with respect to Mendoza and appellant commenced on April 17, 2019. The following evidence was adduced at trial.

---

[2] All statutory references are to the Penal Code unless otherwise indicated.

## A. Prosecution Evidence

### i. *Kennedy Park Shooting and Prosecution*

In 2008, four members of the Decoto XIV (Decoto) gang—Noel Cruz, Raymond Romo, Damien Alaniz, and Joel Perry—attempted a robbery in Kennedy Park, an area in Union City claimed as Decoto territory. When the victims resisted, the gang members shot them both, killing one and injuring the other.

In 2011, DelToro, a member of the Decoto gang, was arrested for committing an unrelated felony. In response to questioning by Union City detectives, DelToro identified Cruz, Romo, Alaniz, and Perry as individuals involved in the Kennedy Park incident. The surviving victim corroborated this story by identifying one of the named gang members as one of his assailants. DelToro dropped out of the Decoto gang and testified for the prosecution at the preliminary hearing. Cruz, Alaniz, and Romo all pleaded guilty and were sentenced to lengthy prison terms. Romo received an 11-year sentence for his role in the shooting. Perry proceeded to trial and was convicted as a result of DelToro's testimony.

Following the trial, detectives learned that DelToro had been identified on a "bad news list," a hit list of former gang members who had dropped out or "snitched" and were no longer in good standing with the gang. Bad news lists prescribe gang retribution, including beatings, stabbings, and murder. In exchange for cooperating with the Kennedy Park prosecution, DelToro received a reduced sentence of six years served in local jail to help protect him from possible retaliation.

### ii. *Murder of DelToro*

On the afternoon of July 19, 2017, law enforcement officers responded to a 911 call of gunshots in Union City. The officers found DelToro

unresponsive and bleeding, with an overturned stroller nearby and a neighbor watching DelToro's infant son. The woman had run outside after hearing the gunshots to check on the baby. DelToro suffered six entry gunshot wounds to his chest, back, and thighs. He was pronounced dead at the scene.

The neighbor testified that she heard gunshots, saw DelToro on the ground, and called 911. Her husband saw a car with a driver and at least two passengers. Another individual wrote a partial license plate number on a trash can nearby. Using surveillance footage and the partial license plate number, sheriff's deputies determined that a vehicle matching the description belonged to Boden's grandmother. Boden was arrested and eventually cooperated with the investigation.

Boden testified against Mendoza and appellant at trial pursuant to a plea deal under which she received six years in prison in exchange for her truthful testimony. Boden had been romantically involved with appellant in 2017. She owned an illegally purchased firearm, a nine-millimeter Llama, that she gave to appellant about two weeks before the shooting. Appellant, a member of the North Side Oakland gang, was friends with Mendoza.

On July 19, 2017, Boden drove her grandmother's Toyota Camry to Mendoza's house at appellant's request. Appellant then asked Boden to drive him and Mendoza to buy marijuana at a nearby house. On the way, Mendoza saw DelToro walking down the street pushing his infant son in a stroller. Mendoza was irritated and explained that DelToro was a snitch. Appellant stated that he understood, as he had a friend who had been sentenced to 50 years in prison after someone snitched on him. Mendoza said he wanted to "fire on" DelToro, which Boden understood to mean he wanted to fight DelToro. Appellant stated he needed to "get on him." Boden said she did not

4

think they should fight him while he was with his baby, and Mendoza agreed. She drove them back to Mendoza's house.

After Mendoza exited the car, appellant asked Boden to drive around the block to see where DelToro was headed, stating: " 'You're not supposed to ever give a snitch a chance to tell again.' " Boden was afraid but did not refuse because appellant was "not the type of person you say 'no' to." After noting DelToro's location, Boden drove appellant back to Mendoza's house. Later that day, Mendoza got back into the vehicle carrying socks and a pair of jeans. Appellant repeated that you should "never give[] a snitch a chance to tell again."

According to Boden, as she drove past DelToro, Mendoza told her to stop and began exiting the car. With socks on his hands, Mendoza pointed a gun at DelToro. DelToro stopped pushing the stroller, put his hands in the air, and screamed, " 'My son, my son.' " The gun did not fire, and DelToro fought Mendoza for control of the weapon. Mendoza yelled to appellant, " 'Kill him, kill him.' " Appellant exited the car armed with a gun and fired multiple shots at DelToro. Boden drove appellant and Mendoza back to Mendoza's house. Mendoza was bleeding from his arm and accused appellant of shooting him. Appellant apologized and said it was not intentional. Boden left the two at Mendoza's house and drove away.

Boden was arrested the night of the murder. Sheriff's deputies located appellant and placed him under arrest on August 4, 2017. Mendoza was arrested on August 17, 2017, when he reported to his probation officer. At that time, he had an apparent gunshot wound to his arm. Mendoza's mother was interviewed that day by detectives and reported that Mendoza had told her he and DelToro got into a fight when DelToro tried to take his gun so appellant shot and killed DelToro. DNA from blood in Boden's car and at the

crime scene was matched to Mendoza's DNA. The surveillance video obtained by the police was played at trial. The video showed Mendoza with a gun, his struggle with DelToro, and appellant shooting his gun at DelToro.

### iii. *Gang Expert Testimony*

Officer Gabriel Urquiza testified as a gang expert concerning the North Side Oakland gang (also known as Ice City) and its subsets, including the Bushrod gang. He opined that North Side Oakland/Bushrod was a criminal street gang and detailed evidence supporting appellant's membership in the gang. Urquiza testified that a music video of appellant's rap song "On My Job"—in which appellant and Mendoza both appeared—announced a connection between the Ice City and Decoto gangs by spelling out the words "Ice City to Decoto." In response to a hypothetical in which a North Side Oakland gang member and a Decoto gang member saw a snitch on the street and murdered that snitch, Officer Urquiza opined that the murder would be for the benefit of both gangs because the reputations of both individuals and both gangs would benefit from their willingness to commit a violent act against the snitch. Urquiza testified as to certain predicate offenses committed by the North Side Oakland/Bushrod gang.

Detective Andrew Gannam testified as a gang expert concerning the Decoto gang. He described characteristics of the Decoto gang and testified that he had personally obtained DelToro's statement incriminating Decoto gang members in the Kennedy Park shooting. He opined that Mendoza was a member of the Decoto gang. Detective Victor Ramirez testified as an expert witness with respect to the investigation of gang-related crimes. He testified that appellant was a North Side Oakland gang member. He also described the composition, characteristics, and activities of the Decoto gang. Ramirez

6

provided evidence of Mendoza's membership in the Decoto gang and testified regarding certain predicate offenses committed by the Decoto gang.

Detective Ramirez testified that Mendoza was an aspiring rap artist who had recorded a song called " '100 Bars Part 2.' " After audio of the song was played for the jury, Detective Ramirez was asked to explain the meaning of certain lyrics from the song. According to the lyrics, Mendoza could not wait until Raymond Romo, a Decoto gang member involved in the Kennedy Park prosecution, was released from custody. The next several lines of the song were a reference to DelToro: " 'We gonna find that fuckin' nigga,' . . . [and] 'We gonna air his ass out. Real killas put the barrel in your mouth.' " Based on the "On My Job" music video, Detective Ramirez opined that Mendoza and appellant had formed an alliance and that gang members fortify such alliances by committing crimes. In response to a hypothetical tracking the facts of the instant offense, Detective Ramirez opined that both of the individuals who murdered the snitch, as well as their respective gangs, would benefit from enhanced reputations for violence. On the other hand, if a gang member stood by and failed to come to the aid of a fellow gang member who needed help, both that gang member's reputation and the reputation of his gang would suffer.

## B.    Defense Evidence

Appellant testified in his own defense. In 2010, he was convicted of robbery and sentenced to seven years eight months in prison. Following his release, he experienced some success in his gangster rap career. He met Mendoza through their shared interest in music. Part of his rap music included claiming the neighborhood of Bushrod Park and playing a persona rather than his real self. He denied ever belonging to a gang and stated he had not known Mendoza to associate with Decoto gang members. Appellant

7

had never heard of DelToro before the day of the shooting when Mendoza identified him as a snitch. When they drove by DelToro again, Mendoza pulled a gun. Appellant did not know that Mendoza was armed but assumed DelToro was. Boden gave appellant the gun from her purse. He watched Mendoza and DelToro struggle over Mendoza's gun and heard Mendoza say, "'Help, B, help.'" He got out of the car, heard a shot go off, and repeatedly shot DelToro because he "didn't want to get shot."

Mendoza elected not to testify. During closing arguments, his defense counsel stressed that Mendoza's gun never fired. He argued that it was reasonably possible from the evidence presented that Mendoza only wanted to confront, frighten, and fight DelToro, not kill him.

## C.    Conviction and Sentence

On May 9, 2019, the jury found Mendoza and appellant guilty of first degree murder and possession of a firearm by a felon and found true all related special circumstances, enhancements, and special allegations. In a bifurcated proceeding, the trial court found true appellant's prior strike conviction. The trial court sentenced appellant to prison for 75 years to life. Appellant's timely notice of appeal followed.

## II. DISCUSSION

### A. Motion to Sever

*i.    Additional Background*

<u>*Preliminary Hearing*</u>.[3]    At the December 2017 preliminary hearing, Mendoza's mother testified that DelToro and her son grew up together. On

---

[3] Because we review a trial court's decision not to sever for abuse of discretion based on the record when the motion is heard (*People v. Elliot* (2012) 53 Cal.4th 535, 552 (*Elliot*)), we include here a brief summary of the facts elicited at the preliminary hearing which preceded appellant's pretrial motion to sever.

the day of DelToro's murder, Mendoza and appellant were at her house a few blocks from the crime scene. In a prior interview with police, she sensed that something was going on that day. She told investigators there was a lot of commotion back and forth, and appellant kept whispering something in her backyard. She also acknowledged that the shooting occurred about 10 to 15 minutes after appellant and her son left the house. Shortly after the shooting, appellant ran into the house to use the bathroom and then left. Later, Mendoza told his mother that he had fought with DelToro, but appellant shot him.

Detective Paxton testified about his response to the crime scene and the course of the ensuing investigation. He related DelToro's history as a former Decoto gang member who had testified against other Decoto gang members; he described Mendoza's rap song suggesting retribution against Del Toro; and he narrated various surveillance videos which showed Boden's car travelling repeatedly (no less than six times) past DelToro before it stopped and the murder unfolded. Detective Paxton also introduced and read a letter Boden sent to a friend from jail in which Boden reported meeting appellant a month before the murder, stated he had threatened Boden's daughter when she tried to pull back from him due to his criminality, and described Mendoza wanting to " 'fire on' " DelToro because he was a snitch and that appellant emptied " 'the whole clip' " into DelToro after Mendoza's gun jammed and he asked for help.

Finally, Detective Ramirez testified as a gang expert regarding the origin, tattoos, hand signs, colors, and prior crimes of the Decoto gang. After describing Mendoza's tattoos, use of hand signs, gang contacts, and behavior in appellant's rap video "On My Job," Ramirez opined that Mendoza was a Decoto gang member on the day of the DelToro murder. Ramirez also opined

9

that appellant was a North Side Oakland/Ice City gang member on the day of the murder. He described appellant's tattoos, hand signs, and monikers, as well as the Bushrod subset of North Side Oakland. He opined that the murder of a snitch like DelToro would be for the benefit of the Decoto street gang.

*Motion to Sever*. In August 2018, while the joint trial of appellant, Mendoza, and Boden was pending, appellant filed a motion to sever his case from Mendoza's. Appellant claimed he knew nothing about Mendoza's plan to shoot and kill DelToro, asserting that he only shot DelToro when it appeared DelToro was about to kill Mendoza. During a July 2018 jail visit, appellant reportedly told his defense attorney that Mendoza had reached out to him and indicated that, if the two men were tried separately, Mendoza would testify "that his actions were spontaneous, and that defendant Follings was given no indication that he planned to assault and attempt to kill [DelToro]." Mendoza, however, would not testify in a joint trial due to "gang rules" and issues with self-incrimination. Arguing that Mendoza was the only witness who could support his "defense-of-another theory" and that the expected testimony "confirming the spontaneity of the crime would provide critical evidence of [his] innocence," appellant asked the trial court to exercise its discretion to sever his trial from that of Mendoza.

The prosecutor opposed the motion to sever, noting that appellant and Mendoza were charged with the same offenses stemming from the same facts. Although the trial court had the discretion to order separate trials in an appropriate case, the prosecutor argued this was not such a case. He asserted that the possibility of conflicting or antagonistic defenses did not justify the requested severance and that the claim that Mendoza would offer exonerating testimony in a separate trial was not adequately supported.

10

After a hearing on September 7, 2018, the trial court denied the motion. In doing so, the court indicated to defense counsel: "[W]e've got what Mr. Mendoza reportedly said to your client . . . that your client has communicated to you, that you communicated to us. But that's all we've got . . . as the basis for this motion." When the court asked the "obvious question" why further inquiry had not been made about the matter through Mendoza's defense counsel, appellant's attorney stated that he had made inquiries without success.[4] The court expressed concern about the amount of time appellant's trial would have to wait until Mendoza was tried and his appellate rights exhausted. The trial court then ruled: "We'd have to make a lot of leaps of faith and a lot of speculation, and for that reason, I'm going to deny the motion to sever. I just am not satisfied that there is—there's a true, reasonable expectation that should I grant the severance motion that what is being sought, the purpose of it, would actually ever occur." The court also stated a concern that the two defendants might have gotten together and "concoct[ed] a reason to try to get a severance."

### ii. Relevant Law

"Our Legislature has expressed a strong preference for joint trials." (*People v. Souza* (2012) 54 Cal.4th 90, 109 (*Souza*).) "Joinder is ordinarily favored because it avoids the increased expenditures of funds and judicial resources that may result from separate trials" and, therefore, " 'is the course of action preferred by the law.' " (*People v. Simon* (2016) 1 Cal.5th 98, 122 (*Simon*).) Indeed, the California Constitution expressly provides that it "shall not be construed by the courts to prohibit the joining of criminal cases

---

[4] Only appellant and his counsel were present at the motion hearing because neither Mendoza nor Boden had joined in the severance request.

11

as prescribed by the Legislature or by the people through the initiative process." (Cal. Const., art. I, § 30, subd. (a).)

We review a trial court's decision not to sever for abuse of discretion based on the record when the motion is heard. (*Elliot, supra*, 53 Cal.4th at p. 552.)[5] Whether a trial court abused its discretion in denying severance depends on the particular circumstances of each case. (*Simon, supra*, 1 Cal.5th at p. 123.) "Where, as here, the statutory requirements for joinder are met, a defendant must make a 'clear showing of prejudice' to establish that the trial court abused its discretion in denying the motion." (*Id.* at pp. 122–123.) Finally, "even if the trial court's ruling was proper as a matter of state law, we will reverse the judgment if the defendant shows that joinder of the charges actually resulted in ' " 'gross unfairness' " ' amounting to a denial of due process." (*Id.* at p. 123; *Ervin, supra*, 22 Cal.4th at p. 69 ["a reviewing court may reverse a conviction when, because of consolidation, ' "gross unfairness" ' has deprived the defendant of a fair trial"].)

Section 1098 provides in pertinent part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they *must be tried jointly*, unless the court order[s] separate trials." (Italics added.) The court's discretion to order severance of defendants is guided by certain nonexclusive factors, " 'such that severance may be appropriate "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." ' " (*Souza, supra*, 54 Cal.4th at p. 110.) A

---

[5] If further developments occur during trial that a defendant believes justify severance, he or she must renew the motion to sever. (*People v. Ervin* (2000) 22 Cal.4th 48, 68 (*Ervin*).) Appellant does not argue that he did so in this case, and we have found no evidence of a renewed motion.

court considering a motion to sever based on the possibility that a codefendant might then offer exonerating testimony should consider the following factors: (1) whether the moving defendant desires the testimony of the codefendant; (2) whether the testimony will be exculpatory; (3) whether the testimony is significant; (4) whether the court is satisfied that the testimony itself is bona fide; (5) how strong the likelihood is, based on the showing at the time of the motion, that the codefendant will testify as anticipated if severance is granted; and (6) the effect of granting severance on judicial administration and economy. (*People v. Isenor* (1971) 17 Cal.App.3d 324, 332 (*Isenor*).)

Typically, when defendants are " 'charged with the same crimes arising from the same events' " the court is presented with a "classic case for a joint trial." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 379 (*Wheeler*).) Moreover, "[s]imply because the prosecution's case will be stronger if defendants are tried together, or that one defense undermines another, does not render a joint trial unfair." (*Ibid.*) "Indeed, important concerns of public policy are served if a single jury is given a full and fair overview of the defendants' joint conduct and the assertions they make to defend against ensuing charges." (*Ibid.*)

### iii. Joinder of Trial Was Not An Abuse of Discretion

On appeal, appellant argues that the trial court's refusal to sever Mendoza's trial from his was an abuse of discretion because it denied him the opportunity to present the exculpatory testimony Mendoza would offer. He also contends that even if the trial court's ruling was proper when made, the result of the ruling was " ' "gross unfairness" ' " amounting to a denial of his constitutional rights to due process and a fair trial. We reject both claims.

13

Although appellant acknowledges that *Isenor* is often cited in cases involving a severance motion based on an offer of exculpatory testimony, he spends considerable time criticizing the legal framework *Isenor* announces and attempting to distinguish the case on its facts. We find the factual differences identified by appellant immaterial to our analysis and the factors adopted by the *Isenor* court instructive. Indeed, this District has previously followed *Isenor* under similar circumstances. (*People v. Conerly* (2009) 176 Cal.App.4th 240, 250–253 (*Conerly*).) We see no reason to do otherwise.

Considering the first three *Isenor* factors, it is clear that appellant desired Mendoza's testimony and that, had Mendoza testified in the manner suggested by appellant, such testimony would have been exculpatory and of some significance to his defense. (*Isenor, supra*, 17 Cal.App.3d at p. 332.) However, the latter three *Isenor* factors persuade us that the trial court's denial of severance was not an abuse of discretion.

First, the trial court was justifiably skeptical that the testimony from Mendoza was bona fide. The *Isenor* court "recognized that in cases in which an appellate court has held that severance should have been granted, the codefendant exculpated the defendant in an affidavit, in open court or in statements to the police, or there was an otherwise reliable indication the codefendant would testify in a way that actually exonerates the defendant." (*Conerly, supra*, 176 Cal.App.4th at p. 251.) Here, no affidavit or statement by Mendoza was offered to support the claim that he would testify as appellant had suggested. The only indication that Mendoza was willing to offer exculpatory testimony was a secondhand report of what Mendoza reportedly said to appellant, that appellant communicated to his attorney, and that his attorney then communicated to the court. Without any evidence to corroborate counsel's assertion, the trial court had very little basis to

14

accept the assertion as true. "It is not error to deny a motion to sever based solely on defendant's bald assertion that someone has made an exonerating statement in his behalf." (*Isenor, supra*, 17 Cal.App.3d at p. 333.) In addition, the silence from Mendoza's defense counsel—both in failing to respond to inquiries from appellant's counsel and in declining to join in the motion to sever—was telling and raises serious questions whether Mendoza would testify on appellant's behalf.

Moreover, as the prosecution pointed out, if Mendoza were tried and convicted of murder, his Fifth Amendment privilege against self-incrimination would extend through any appeal, and therefore severance would require delaying the trial against appellant until after Mendoza's judgment became final. The trial court determined it was unwilling to substantially delay appellant's trial on the basis of "leaps of faith" and "speculation" that Mendoza would give exculpatory testimony at some point in the future. We see no cause to question this decision. "The absence of substantial proof that a codefendant would be willing to testify for the defendant at a later date is, in itself, grounds for denying a motion for severance." (*Isenor, supra*, 17 Cal.App.3d at p. 334.)

Considerations of judicial administration and economy also weighed against severance. This was a lengthy criminal trial with numerous witnesses in which the evidence against both Mendoza and appellant was largely the same. It was clearly more efficient to conduct a single trial than to present similar evidence in two trials before separate jury panels. "While the concern for judicial efficiency, by itself, does not outweigh a defendant's right to a fundamentally fair trial, it is nonetheless a proper factor for a court to consider in weighing the severance decision." (*Conerly, supra*, 176 Cal.App.4th at p. 252.)

15

Given these considerations, we see no abuse of discretion in the trial court's decision to deny severance.  Rather, we view the matter as one in which "concerns of public policy [have been] served [by] a single jury [being] given a full and fair overview of the defendants' joint conduct and the assertions they [made] to defend against ensuing charges." (*Wheeler, supra*, 60 Cal.4th at p. 379.)[6]

### iv.    No "Gross Unfairness" in the Trial Court's Decision

For similar reasons, we see no evidence that joinder of the charges actually resulted in " ' " 'gross unfairness' " ' amounting to a denial of due process." (*Simon, supra*, 1 Cal.5th at p. 123; *Ervin, supra*, 22 Cal.4th at p. 69.)  "In determining whether joinder resulted in gross unfairness, we have observed that a judgment will be reversed on this ground only if it is reasonably probable that the jury was influenced by the joinder in its verdict of guilt." (*Simon*, at pp. 129–130.)  The evidence offered to prove appellant's guilt with respect to DelToro's murder was distinct from the evidence implicating Mendoza in the crime charged, making juror confusion unlikely.  Moreover, as discussed above, the evidence against appellant was strong and included video surveillance of the crime, eyewitness testimony by a coresponsible, and gang evidence regarding the context and motive of his participation in these events, all of which was subject to vigorous cross-

---

[6] We also reject appellant's suggestion that the trial court erred by failing to give defense counsel more time to obtain stronger evidence of Mendoza's willingness to testify.  It was appellant's own motion and his obligation to renew it if stronger evidence became available. (See *Ervin, supra*, 22 Cal.4th at p. 68.)  As appellant himself notes, over six months elapsed between the motion to sever and the trial.  If anything, that the severance motion was not renewed suggests that Mendoza's willingness to give exculpatory testimony never rose above the level of speculation.

examination. In addition, appellant testified directly as to his own, less culpable, version of events.

Appellant argues that, at the time the severance motion was heard, the court and parties were unaware that Boden would make a deal and testify for the prosecution. He asserts that this made Mendoza's exculpatory testimony even more crucial because it would have acted as a "counterweight" to Boden's testimony. He also contends that the joint trial was grossly unfair because the trial court admitted Mendoza's rap song promising to get revenge on DelToro. Finally, the joint trial precluded Mendoza from testifying about the "On My Job" rap video and whether his hand signs in the video in fact signaled an alliance between the Ice City and Decoto street gangs. We are not persuaded that these circumstances resulted in a constitutionally infirm trial.

Appellant was not precluded from presenting a defense that he had no knowledge of Mendoza's plan to kill DelToro. Appellant testified that he had never heard of DelToro prior to the day of the shooting, he did not know that Mendoza was armed until he exited the car to shoot DelToro, and that he got out of the car after watching Mendoza struggle with DelToro over Mendoza's gun and hearing Mendoza call out " 'Help, B, help.' " Video surveillance footage of these events was played for the jury. In addition, Boden testified that she heard nothing about a plan to assault DelToro while driving around in the car with appellant. Thus, the jury was presented with evidence that appellant had acted spontaneously in defense of a friend, not out of a premeditated plan to kill DelToro for having been a gang snitch.

We are also unpersuaded that joinder of trial was grossly unfair because of the rap video and appellant's inability to call Mendoza to testify about it. As we explain below, there is no merit to appellant's contention that

17

admission of this evidence was an abuse of discretion or resulted in a confrontation clause violation. But even if the video evidence raised the unwarranted suggestion that a gang alliance had been formed, appellant rebutted that suggestion through his own testimony. Appellant testified that the hand signs made by Mendoza simply reflected two rap artists teaming up and acknowledging where they came from, not announcing an alliance between two street gangs. The jury was free to determine which interpretation of the rap video it believed.

Finally, there was voluminous evidence presented about the Kennedy Park shooting, how DelToro's cooperation with the police had put him in danger, and appellant's knowledge that DelToro was a snitch. Thus, even if appellant were correct that severance would have precluded any evidence in his trial about Mendoza's rap song "100 Bars Part 2," appellant does not contend that this other evidence demonstrating why DelToro had been targeted for attack would have also been excluded. A joint trial is not rendered unfair "[s]imply because the prosecution's case will be stronger if defendants are tried together." (*Wheeler*, *supra*, 60 Cal.4th at p. 379.) In sum, joinder of the two codefendants did not result in gross unfairness amounting to a due process violation.

## B.     Admission of Gang Signs in "On My Job" Video

### i.     *Additional Background*

On April 17, 2019, the trial court held a hearing pursuant to Evidence Code section 402 to determine the admissibility of gang-related evidence with respect to appellant in the upcoming trial. Appellant's attorney argued that the murder of DelToro was committed for the benefit of the Decoto gang and appellant's gang membership and activities were therefore irrelevant. The prosecution responded that the crime benefited both Decoto and North Side

18

Oakland and so evidence regarding appellant's affiliation with the North Side Oakland gang was relevant. After hearing testimony from gang expert Officer Urquiza, the court concluded that the evidence was relevant and admissible under the theory presented by the prosecution, and was not unduly prejudicial under the circumstances of the case.

Appellant's defense counsel then specifically objected to a portion of appellant's rap video "On My Job" on Sixth Amendment confrontation clause grounds. He explained: "[M]y objection is to the admission of the portion of the video, the rap video that shows Mr. Mendoza signing I believe it is Decoto Ice City. I can't cross-examine Mr. Mendoza on what he meant by that. It may have been— he might answer the question that, you know, I signed these letters because there was an alliance between [North Side Oakland] and Decoto. [¶] But he also might say that there was no such alliance. That was merely my acknowledging where my friend was from. The music rap world is replete with artists teaming up and acknowledging—acknowledging where the other person—where the artist lives within the rap song." Defense counsel also objected to the evidence under Evidence Code section 352. The prosecution countered that the evidence was "highly relevant" in this gang case and that, since appellant authored, produced, and posted the video, Mendoza's hand signs within the video were an adoptive admission.

The trial court concluded that Mendoza's hand signs were not testimonial. It found them "very relevant" to the "gang aspect or the gang allegations in the case." Although the court conceded the evidence "may be prejudicial in the eyes of some," it determined it was not "unduly prejudicial . . . in the sense that the law characterizes that phrase." The video was admitted into evidence.

*ii.    No Sixth Amendment Violation*

While appellant's opening brief mentions in passing that the admission of the rap video violated his Sixth Amendment confrontation rights, the brief contains no reasoned analysis of the issue.  On this basis alone, we could decline to consider the matter.  (*Levin v. Ligon* (2006) 140 Cal.App.4th 1456, 1486 ["It is elementary that points raised for the first time in a reply brief are not considered by the court."].)  However, because the Attorney General addresses the confrontation issue in his briefing and appellant folds his inability to cross-examine Mendoza into other arguments, we briefly address and reject the constitutional claim.

 "[A]dmission of testimonial hearsay against a criminal defendant violates the confrontation clause unless (1) the declarant is unavailable to testify and (2) the defendant had a previous opportunity to cross-examine the witness or forfeited the right by his own wrongdoing." (*People v. Sanchez* (2016) 63 Cal.4th 665, 680, citing *Crawford v. Washington* (2004) 541 U.S. 36, 62, 68.)  "[T]he term 'testimonial' 'applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.'" (*Sanchez*, at p. 687.)  As the concept has been refined over time, "[t]estimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Id.* at p. 689.)  Mendoza's hand signs denoting "Ice City to Decoto" could constitute a statement. (See Evid. Code. § 225 ["statement" includes "nonverbal conduct of a person intended by [him or her] as a substitute for oral or written verbal expression"].)  But we agree with the trial court that these hand signs did not constitute a *testimonial* statement

20

for Sixth Amendment purposes because their primary purpose was not to preserve facts for a later trial. Rather, the statement was made in an informal setting as a means of artistic expression.

We also agree with the Attorney General that the hand signs constitute an adoptive admission by appellant. "The law pertaining to adoptive admissions is well settled. 'Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth.' (Evid. Code, § 1221.)" (*People v. Jennings* (2010) 50 Cal.4th 616, 661 (*Jennings*).) " 'When a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1189.) As our high court has explained, "when a defendant has adopted a statement as his own, 'the defendant himself is, in effect, the declarant. The 'witness' against the defendant is the defendant himself, not the actual declarant; there is no violation of the defendant's right to confront the declarant because the defendant only has the right to confront "the witnesses against him." ' " (*Jennings*, at p. 662.)

The rap video entitled "On My Job" was created by appellant. Appellant testified that the song was his (performed in his persona Bushrod Beezy) and included appearances by a number of his cousins in addition to himself and Mendoza. He uploaded it to YouTube through his username Bushrod_Beezy. The video shows Mendoza displaying hand gestures or signs

21

that signify "Ice City to Decoto."[7]  It is reasonable to assume that if appellant did not agree with the "statement" made by Mendoza in the video, he could have edited out Mendoza's involvement before publishing the rap song under his name.  We agree with the trial court that this was sufficient to qualify the hand signs as an adoptive admission and its finding that the rap video was admissible on that basis and not subject to Sixth Amendment constraints.

### iii.    No Abuse of Discretion Under State Law

Even if the rap video was admissible, appellant argues it should have been excluded under Evidence Code section 352 as more prejudicial than probative.  Only relevant evidence is admissible at trial.  (Evid. Code, § 350.) Evidence Code section 210 defines relevant evidence as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  Under Evidence Code section 352, a trial court has "broad discretion . . . to exclude even relevant evidence if it determines that the probative value of the evidence is substantially outweighed by its possible prejudicial effects." (*People v. Merriman* (2014) 60 Cal.4th 1, 74; Evid. Code, § 352.)  We review a trial court's rulings under Evidence Code section 352 for abuse of discretion. (*People v. Coneal* (2019) 41 Cal.App.5th 951, 964 (*Coneal*); *People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

Gang evidence " 'is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. [Citations.] . . . [¶] However, gang evidence

---

[7] As discussed above, several gang experts opined that Mendoza's gang signs in the video announced an alliance between the North Side Oakland and Decoto gangs.  Appellant claimed that the hand signs made by Mendoza simply acknowledged where the two rappers came from, rather than announcing an alliance.  The matter thus presented a factual dispute for resolution by the jury.

is inadmissible if introduced only to "show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]" [Citations.] . . . Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, "trial courts should carefully scrutinize such evidence before admitting it." ' " (*Coneal*, *supra*, 41 Cal.App.5th at p. 964.) The fact that the evidence tends to establish elements of the prosecution's case does not render it prejudicial for purposes of Evidence Code section 352. (*People v. Tran* (2011) 51 Cal.4th 1040, 1050.)

Although appellant challenges the prejudicial effect of admitting the hand signs, he appears to take issue with the gang experts' *interpretation* of those hand gestures rather than the admission of the rap video itself. Specifically, appellant contends that the "meaning of Mendoza throwing hand signs for both Decoto and Ice City was ambiguous at best" and at worst, "was prejudicially misleading because it transformed a friendship between two aspiring rappers into a gang alliance for which there was no evidence." We disagree. "Since at least 1980, our courts have recognized that evidence of gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony." (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.) The gang experts' opinion that Mendoza was flashing gang signs in the rap video that announced an alliance between Mendoza and appellant and their respective gangs was the proper subject of gang expert testimony. The video was clearly relevant to the gang allegations charged against both defendants and whether their actions were committed for the benefit of and in association with a criminal street gang.

Moreover, the probative value of this evidence was not substantially outweighed by the probability that its admission would unduly prejudice or

23

confuse the jury. Prejudice in this context " 'is not synonymous with "damaging," but refers instead to evidence that " 'uniquely tends to evoke an emotional bias against [a] defendant' without regard to its relevance on material issues." ' " (*People v. Zepeda* (2008) 167 Cal.App.4th 25, 35.) Appellant's assertion that the experts' suggestion of a gang alliance was damaging to his case is not the type of prejudice contemplated by Evidence Code section 352.

Nor was the gang video evidence likely to evoke an emotional response against the defendants. The jury was shown surveillance video evidence of the killing of DelToro by Mendoza and appellant while DelToro's infant son was present. It also heard substantial evidence about the Kennedy Park shooting and other criminal offenses committed by gang members. The music video displayed no violence and was mild in comparison. And, as stated above, appellant offered a benign interpretation of the hand signs for the jury to consider. Under the circumstances, we see no abuse of discretion in the trial court's admission of the portion of appellant's rap video in which Mendoza signed "Ice City to Decoto."

## C. Substantial Evidence Supports the Murder Conviction

### i. *Relevant Law*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) Express malice means "a deliberate intention to unlawfully take away the life of a fellow creature." (*Id.*, subd. (a)(1).) Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Id.*, subd. (a)(2).) "A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder. [Citation.] 'Second degree

murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 942; see § 189, subds. (a) & (b).)

"To prove the killing was 'deliberate and premeditated,' it is not necessary to prove the defendant maturely and meaningfully reflected upon the gravity of [his or her] act." (§ 189, subd. (d).) " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.] In this context, ' "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " (*Jennings, supra,* 50 Cal.4th at p. 645.) "The *extent* of the reflection is key, not its *duration*; thoughts may rapidly follow each other and a cold and calculated judgment to kill may be arrived at very quickly." (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 491 (*Pettigrew*) [citing cases].)

Our high court has identified three categories of evidence to consider when determining whether a murder was deliberate and premeditated: planning activity, motive, and the manner of the killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*).) When the record contains evidence in all three categories, the verdict is generally affirmed. (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) " 'However, these factors are not exclusive, nor are they invariably determinative. " (*People v. Streeter* (2012) 54 Cal.4th 205, 242 (*Streeter*).) "[T]hey are merely intended to guide a reviewing court's assessment of whether the evidence supports a reasonable inference that the killing was the result of the defendant's preexisting reflection and not the

result of an unconsidered or rash impulse." (*Pettigrew*, *supra*, 62 Cal.App.5th at p. 492.) "A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner." (*People v. Romero* (2008) 44 Cal.4th 386, 401, citing *Anderson*, at p. 27.)

"In reviewing a criminal conviction challenged as lacking evidentiary support, ' "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*Streeter*, *supra*, 54 Cal.4th at p. 241.) When undertaking such an analysis, we do not reevaluate witness credibility or resolve conflicts in the evidence, because "[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).) In addition, we " 'must accept logical inferences that the jury might have drawn from the evidence even if [we] would have concluded otherwise.' " (*Streeter*, at p. 241.)

"[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Young*, *supra*, 34 Cal.4th at p. 1181.) Moreover, "[i]f the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) In sum, the relevant question before us is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

*ii.      Substantial Evidence of Premeditation and Deliberation*

Appellant argues there was insufficient evidence to support the jury's verdict of first degree murder.  Specifically, he asserts that if there was any plan to kill DelToro, it was for Mendoza to do the shooting while appellant sat in the car.  Since it was only after Mendoza called for help that appellant got out of the car and "in a panic" shot DelToro, he contends that there was insufficient evidence of premeditation and deliberation.  We disagree.

With respect to planning, appellant concedes there was evidence of a plan to shoot DelToro but argues there was no evidence the plan included him doing the shooting.  This, however, is beside the point.  "Aiders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles.  [Citation.]  Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission."  (*People v. Chiu* (2014) 59 Cal.4th 155, 166–167, superseded by statute on other grounds as stated in *People v. Gentile* (2020) 10 Cal.5th 830, 848–849.)  Thus, "[a]n aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent."  (*Chiu*, at p. 167; see also *People v. McCoy* (2001) 25 Cal.4th 1111, 1117–1118.)

There is substantial evidence that appellant and Mendoza together planned to kill DelToro, and that appellant encouraged and facilitated the commission of the murder, ultimately by pulling the trigger himself.  When Mendoza first saw DelToro pushing the baby stroller and stated he wanted to "fire on" him because he was a snitch, appellant responded that he needed to

27

" 'get on him.' " After Boden commented that she did not think they should do anything with the baby present, Mendoza agreed and the three returned to Mendoza's house. After leaving Mendoza at the house, appellant instructed Boden to drive him back down the block to see where DelToro was going because "You're not supposed to ever give a snitch a chance to tell again." After they passed DelToro going the opposite direction, appellant told Boden to turn around because he wanted to find out where DelToro was headed. Boden became frightened because she thought appellant was going to hurt DelToro, but she did what appellant directed because he was "not the type of person you say 'no' to." Boden circled the block until appellant told her to go back to Mendoza's house. Boden testified that the nine-millimeter firearm she had given appellant several weeks earlier was hidden beneath his seat in her car.

About 15 to 20 minutes before the shooting, Mendoza's mother overheard appellant and Mendoza in the backyard whispering, "Fuck that, fuck that." According to Boden, when Mendoza got back into her car, he was carrying some clothing. She drove down the street and spotted DelToro, still with the baby stroller. She knew at that point that something was going to happen. Once she passed DelToro, Boden made a U-turn and headed back towards him. As she drove past DelToro, Mendoza told her to stop and jumped out of the car. He approached DelToro with a white shirt wrapped around his face and pointed a gun at him, but the gun did not go off, and DelToro and Mendoza started fighting. When Boden asked appellant what was going on, he told her to "just calm down" and to "be cool." When Mendoza yelled to appellant to assist him,[8] appellant sighed deeply, retrieved

---

[8] Boden reported that Mendoza yelled to appellant, " 'Kill him, kill him,' " while appellant testified Mendoza cried, " 'Help, B, help.' "

28

Boden's gun from under the seat, got out of the car, and shot DelToro multiple times. Boden also testified that it was appellant who "decided to hunt down" DelToro.

Thus, the evidence established that prior to DelToro's murder, appellant "was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity." (*Anderson, supra,* 70 Cal.2d at pp. 26–27.) While the plan may have called for Mendoza to pull the trigger given his previous gang ties with DelToro, a jury could reasonably infer from appellant's final actions that, when things did not go according to plan, he took a final moment to deliberate and then decided to step in and commit the murder himself. As our high court opined in *Anderson,* a verdict of first degree murder is proper where a defendant " 'killed "as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on cool[l]y and steadily, [especially] according to a *preconceived design.*" ' " (*Id.* at p. 27.)

In addition to the evidence of planning, the jury heard substantial evidence of appellant's motive to kill. When Mendoza initially identified DelToro on the street as someone who had snitched, appellant stated that he understood why Mendoza was upset because he had a friend who had been snitched on who was serving a 50-year sentence in prison. Shortly before the murder, appellant commented several times that " '[y]ou're not supposed to ever give a snitch a chance to tell again.' " According to Officer Urquiza, if a gang member is labeled as a snitch, "he's a snitch across all gangs and is not to be trusted by other gang members." The record indicates that appellant had a personal grudge against gang snitches and supports the reasonable inference that participating in the murder of DelToro aligned with his view

29

that snitches should not be given another chance to harm gang members again.

Finally, appellant testified that, once he got out of the car, he "shot until the gun wouldn't shoot any more." Six entry wounds were identified on DelToro's body and one bullet struck Mendoza in the arm. That appellant—after telling Boden to calm down, sighing deeply, and exiting the car with a gun—emptied the clip into DelToro rather than taking some lesser action to protect Mendoza and himself, also supports a finding of premeditation and deliberation. (See *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1223–1225 [manner of attempted killing supported finding of premeditation and deliberation where six shots were fired from approximately 25 feet away].)

Given the strong evidence of planning and motive in the case, along with the manner in which the killing took place, we reject appellant's substantial evidence challenge to the jury's finding of premeditation and deliberation.

## D. Substantial Evidence Supports the Gang Enhancement

In his initial briefing, appellant asserted—citing *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*)—that to sustain his gang enhancement there must be evidence that both he and Mendoza were members of the same criminal street gang subset or that there was a connection between their subsets. He argued that the only evidence of an alliance between the Decoto and North Side Oakland gangs at trial was Mendoza's hand gesture—" 'Ice City to Decoto' "—in appellant's rap video. According to appellant, the gang experts' testimony about the existence of an alliance based on those hand signals was "conclusory" and "factually unsupported," making imposition of the gang enhancement improper.

30

On the day set for oral argument in this matter, appellant asked for leave to file supplemental briefing regarding the impact of newly enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333) on this case. (See Stats. 2021, ch. 699, §§ 1–5.) Assembly Bill 333 amends sections 186.22 and 1109 to require proof of additional elements to establish a gang enhancement. (Assem. Bill 333, § 3, revised § 186.22, effective Jan. 1, 2022.) We deferred submission of the matter, granted appellant's request, and received briefing from both parties.

Appellant asserts that Assembly Bill 333 should be applied retroactively to his case and that, under the new law, there is insufficient evidence to support imposition of his gang enhancement. He asks us to strike the true finding on the gang allegation and remand the matter so the prosecutor can either elect to retry the allegation or the trial court can resentence. Appellant also suggests that we reassess the prejudice—both individual and cumulative—of any trial errors in light of the changes to section 186.22 and the effects of the evidence presented in the case.

The Attorney General concedes that appellant is likely entitled to the ameliorative effects of Assembly Bill 333's amendments to section 186.22 because appellant's judgment will not be final when the new legislation takes effect. He argues, however, that substantial evidence supports appellant's gang enhancement, even under the amended statute, and thus remand for consideration under the new legislation would be an idle act. Assuming without deciding that the amendments to section 186.22 apply retroactively here, we see no merit to appellant's supplemental claims and agree no remand is necessary.[9]

_____

[9] The Attorney General additionally argues that section 1109—also enacted by Assembly Bill 333 and related to the bifurcation of gang enhancements at trial—is a procedural statute that should only apply

31

*i.*     *Statutory Framework and Impact of Assembly Bill 333*

Section 186.22 provides for enhanced punishment when a person is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22, subd. (b)(1), (4).)  A " 'criminal street gang' " is defined under current law as "any ongoing *organization, association, or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (*Id.*, subd. (f), italics added.)  Effective January 1, 2022, Assembly Bill 333 narrows the definition of " 'criminal street gang' " to "an ongoing, *organized association or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Assem. Bill 333, § 3, revised § 186.22, subd. (f), italics added.)

Assembly Bill 333 also altered the requirements for proving the " 'pattern of criminal gang activity' " necessary to establish the existence of a criminal street gang.  Currently, a "pattern of criminal gang activity" means "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [enumerated] offenses, provided at least one of these offenses occurred after

___

prospectively.  (See *People v. Cervantes* (2020) 55 Cal.App.5th 927, 939–940; *People v. Sandee* (2017) 15 Cal.App.5th 294, 305, fn. 7.)  Since appellant did not raise this issue, we need not decide it here.

the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (§ 186.22, subd. (e).) As of the effective date, Assembly Bill 333 redefines " 'pattern of criminal gang activity' " to require that the last of the predicate offenses "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed," and that the predicate offenses "were committed on separate occasions or by two or more *members, the offenses commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational*." (Assem. Bill 333, § 3, revised § 186.22, subd. (e)(1), italics added.) In addition, the charged offense cannot be used as a predicate offense under the amendments. (*Id.*, subd. (e)(2).)

Thus, pursuant to the new legislation, imposition of a gang enhancement requires proof of the following additional requirements with respect to predicate offenses: (1) the offenses must have "commonly benefited a criminal street gang" where the "common benefit is more than reputational"; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense. (Assem. Bill 333, § 3, revised § 186.22, subd. (e)(1)–(2).) With respect to common benefit, the new legislation explains: "[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or

previous witness or informant." (Assem. Bill 333, § 3, revised § 186.22, subd. (g).)[10] We review the imposition of a gang enhancement for substantial evidence. (See *Prunty*, *supra*, 62 Cal.4th at pp. 71, 81; *People v. Ewing* (2016) 244 Cal.App.4th 359, 379.)

### ii.     *Substantial Evidence Supports the Gang Enhancement*

Appellant first contends that to sustain his gang enhancement, there must be evidence that both he and Mendoza were members of the same criminal street gang subset or there was a connection between their subsets, citing *Prunty*, *supra*, 62 Cal.4th 59. Appellant misapprehends *Prunty*. In that case, the Supreme Court considered "the type of evidence required to support the prosecution's theory that various alleged gang subsets constitute a single 'criminal street gang' " for purposes of proving a gang enhancement. (*Id.* at p. 70.) Our high court concluded that where the prosecution's proof with respect to a gang enhancement turns on the existence of a single " 'criminal street gang' " and is based on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets. (*Id.* at p. 71.) "This 'sameness' requirement means that the prosecution must show that the group the defendant acted to benefit, the group that committed the predicate offenses, and the group whose primary activities are introduced, is one and the same." (*Id.* at p. 81.)

*Prunty* is inapposite because the prosecution here did not posit that the North Side Oakland and Decoto gangs were subsets of the same "criminal street gang." Rather, to prove a gang enhancement in this case, the

---

[10] Assembly Bill 333 also narrows the list of permissible predicate offenses by removing looting, felony vandalism, and specified personal identity fraud violations from the list. (See § 186.22, subd. (e)(13), (20) & (26)–(30); Assem. Bill 333, § 3, revised § 186.22, subd. (e)(1).)

prosecution had to prove that appellant was "convicted of a felony committed for the benefit of, at the direction of, *or in association* with any criminal street gang, with *the specific intent to promote, further, or assist in criminal conduct by gang members*." (§ 186.22, subd. (b)(1), italics added.)  Here, substantial evidence supports the conclusion that appellant murdered DelToro "in association with" both North Side Oakland and Decoto, with the specific intent to promote, further, or assist in criminal conduct by Mendoza, a Decoto gang member.

"[T]he Legislature included the requirement that the crime to be enhanced be committed for the benefit of, at the direction of, or in association with a criminal street gang to make it 'clear that a criminal offense is subject to increased punishment under the [gang enhancement statute and related legislation] only if the crime is "gang related." ' [Citation.]  Not every crime committed by gang members is related to a gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)  Thus, " 'it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang.' " (*Id.* at p. 62.)  However, if two gang members come together "*as gang members*" to commit a crime, they do so  "in association with the gang." (*Ibid.*; see also *People v. Garcia* (2016) 244 Cal.App.4th 1349, 1367 ["Committing a crime in concert with known gang members can be substantial evidence that the crime was committed in 'association' with a gang."]; *People v. Leon* (2016) 243 Cal.App.4th 1003, 1021 [same].])

The evidence overwhelmingly pointed to a gang-related motive for the murder of DelToro—retaliation for his testimony against fellow Decoto gang members.  As detailed above, DelToro was targeted by Mendoza and appellant because he testified against Decoto gang members in the Kennedy Park shooting.  DelToro had been identified on a "bad news list"—a

hit list of former gang members who had dropped out or "snitched"—which announced that the Decoto gang was seeking retribution against him.

Substantial evidence also established that appellant, a North Side Oakland gang member, and Mendoza, a Decoto gang member, committed the murder in "association" with each other as gang members and to benefit the Decoto gang. As discussed above, appellant expressed his own personal motives for assisting Mendoza in the murder, but he also opined that a snitch should never be given the chance to tell again. As Officer Urquiza testified, if a gang member is labeled as a snitch, "he's a snitch across all gangs and is not to be trusted by other gang members." Furthermore, "the act of attacking a snitch benefits the gang, benefits the gang member as he's showing his willingness to assault someone who hurt the gang." Detective Ramirez similarly testified that retaliating against a snitch benefits the Decoto gang because it reinforces the rule that gang members should not testify against one another. Thus, in attacking and murdering a snitch, Mendoza and appellant committed the offense *as gang members* and for gang-related purposes.

Finally, substantial evidence supports the conclusion that appellant acted "with the specific intent to promote, further, or assist in any criminal conduct by gang members"—i.e., Mendoza acting as a member of the Decoto criminal street gang. (§ 186.22, subd. (b)(1).) The evidence supports the conclusion that, when appellant came to Mendoza's aid and shot DelToro, he did so to assist Mendoza in his mission to kill a Decoto snitch.[11]

[11] As stated above, section 186.22, as amended by Assembly Bill 333, provides as follows: "[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational." (Assem. Bill 333, § 3, revised § 186.22, subd. (g).) There was a clear, nonreputational benefit in committing the murder: the "silencing of a . . . previous witness or informant." (*Ibid.*)

Appellant argues that, under the amendments to section 186.22 enacted by Assembly Bill 333, North Side Oakland cannot be considered a "criminal street gang" because the predicate offenses introduced by the prosecution at trial with respect to North Side Oakland all happened more than three years before the charged offense. We agree. DelToro was murdered in July 2017 and the North Side Oakland predicate offenses offered by the prosecution occurred in 2009 and 2010.

This fact, however, does not undermine the gang enhancement conviction. As discussed above, appellant's actions in this case were also taken "in association with" the Decoto gang and with the specific intent to further or assist in criminal conduct by a Decoto gang member. Appellant does not dispute that the Decoto gang is a "criminal street gang" for purposes of the gang enhancement statute or that any other prerequisites for imposition of the gang enhancement on this basis are lacking. Nor could he.

Evidence of the following predicate offenses concerning the Decoto gang was admitted at trial: The 2008 Kennedy Park shooting by Decoto gang members Cruz, Romo, Alaniz, and Perry, which involved charges of murder, attempted murder, and attempted robbery; Noel Cruz's conviction for attempted murder in 2013, which occurred while he was incarcerated with respect to the Kennedy Park shootings; Mendoza's 2014 convictions for drug possession and illegal possession of a firearm; and the pending homicide charges for two other Decoto gang members, Gabriel Martinez and Norberto Daniel Villareal, with respect to the May 2016 murder of a Hog gang member.

Thus, evidence was presented of two or more predicate offenses which were committed on separate occasions or by two or more gang members, with the last offense occurring within three years of the prior offense and within

37

three years of the charged offense.  (Assem. Bill 333, § 3, revised § 186.22, subd. (e)(1).)  In addition, substantial evidence supports the conclusion that these predicate offenses provided a common benefit to the Decoto street gang that is more than reputational.  (*Ibid.*)  The 2008 Kennedy Park shooting involved acts of violence in pursuit of financial gain, and the May 2016 murder of a Hog gang member involved a murder "targeting a perceived or actual gang rival."  (*Id.*, revised § 186.22, subd. (g).)  Cruz's conviction for attempted murder in 2013, in which he and another gang member slashed a victim's throat, solidified the gang's presence in the jail.  (*Ibid.*)  Mendoza's 2014 conviction for illegal possession of a firearm provided the Decoto gang with an armed member on the streets, ready to intimidate or engage in gang-related violence.  (*Ibid.*)  All told, they represent an almost decade-long array of serious and violent gang-related crimes that the gang enhancement statute was enacted to reach.  (Assem. Bill 333, § 2, subd. (d)(5).)  The subsequent murder of DelToro fits into the same pattern of criminality by this street gang.  Accordingly, we conclude that the imposition of appellant's gang enhancement in this case was supported by substantial evidence in the record, whether the evidence is considered under the current version of section 186.22 or the version enacted by Assembly Bill 333.[12]

---

[12] Appellant has also joined in the arguments made on appeal by his codefendant Mendoza that the prosecutor engaged in prejudicial misconduct in this case.  We concluded in our prior opinion involving Mendoza that those claims had been forfeited, and we find no basis to revisit that determination here.  (See *People v. Mendoza, supra,* A157489.)  We also reject appellant's claim of cumulative prejudice.  Since we have identified no errors in the proceedings below, there is nothing here to cumulate.  (See *People v. Griffin* (2004) 33 Cal.4th 536, 600, disapproved on another ground as stated in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.)  Our conclusion with respect to appellant's gang enhancement under newly enacted Assembly Bill 333 does not change this determination.

## III.  DISPOSITION

The judgment is affirmed.

SANCHEZ, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A157571
*People v. Follings*